FILED
2016 Sep-02  AM 11:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **PAUL BOYLE,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | |
| ] | **4:14-cv-01603-KOB** |
| **CITY OF PELL CITY,** ] | |
| ] | |
| **Defendant.** ] | |
| ] | |
| ] | |

## <u>MEMORANDUM OPINION</u>

This case centers on Plaintiff Paul Boyle's allegations that Defendant Pell City discriminated against him on the basis of his disability, in violation of Section 504 of the Rehabilitation Act.

Boyle began working as a Heavy Equipment Operator for the City of Pell City in 2000. In July of 2001, Boyle fractured two vertebrae when he fell off of a roof while doing demolition work for the City. When Boyle returned to work, his supervisor at the time, Mike Martin, accommodated him by allowing him to work as the Street Department Foreman. When Martin indicated that he planned to retire in 2012, Boyle heard from another employee that Greg Gossett was interested in Martin's position and that Gossett would fire Boyle if he got the job. When Gossett became Boyle's supervisor, he removed Boyle from the Foreman position and ordered Boyle to inventory the shop and to operate heavy equipment, both of which are tasks that Boyle contends aggravated his back. Boyle alleges in this lawsuit that Pell City, through Gossett, failed to accommodate Boyle and constructively discharged him, in violation of the Rehabilitation Act, when it removed him from the Street Department Foreman position.

For the reasons stated in this Opinion, the court finds that Pell City's Motion for Summary Judgment is due to be **GRANTED** and that Boyle's claims under the Rehabilitation Act are due to be **DISMISSED**.

The court also finds that Pell City's Motion to Strike is due to be **GRANTED IN PART** and **DENIED IN PART** and that Paul Boyle's Motion to Strike is due to be **DENIED**.

## I.      Procedural History

Paul Boyle filed his Complaint against the City of Pell City on August 18, 2014. Boyle originally asserted claims for failure to accommodate under Section 504 of the Rehabilitation Act; adverse employment action under the Rehabilitation Act; quantum meruit; unjust enrichment; and violation of the Fair Labor Standards Act. Boyle amended his Complaint three times to restructure his original claims and to assert a sixth claim for breach of contract. On June 15, 2015, Pell City moved to dismiss all of Boyle's claims except for his claims under the Rehabilitation Act. On December 7, 2015, the court granted Pell City's Motion to Dismiss, finding that Boyle's FLSA claim and his state law claims for quantum meruit, unjust enrichment, and breach of contract were barred by the applicable statutory limitation periods. On January 14, 2016, Defendant Pell City filed the Motion for Summary Judgment that is the subject of this Opinion. That Motion for Summary Judgment, as well as the parties' related Motions to Strike, have been fully briefed.

## II.     Motions to Strike

Before addressing the Defendant's Motion for Summary Judgment, the court will consider the parties' competing Motions to Strike (docs. 50 & 53), so that it knows the appropriate evidence to consider.

2

When ruling on a motion for summary judgment, the court may not consider evidence that "could not be reduced to an admissible form at trial." *Riley v. Univ. of Ala. Health Serv. Foundation, P.C.*, 990 F. Supp. 2d 1177, 1184 (N.D. Ala. 2014) (citing *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999)). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). However, "when an affiant avers that his statements are based on personal knowledge, a district court is 'bound to accept [such] statements as true, unless the context demonstrate[s] otherwise.'" *HomeBingo Network, Inc. v. Chayevsky*, 428 F. Supp. 2d 1232, at 1239 (S.D. Ala. 2006) (quoting *Martin v. Rumsfeld*, 137 F. App'x 324, 326 (11th Cir. 2005)). "In the absence of circumstances establishing a lack of personal knowledge, this type of explicit averment is sufficient to satisfy the personal knowledge requirement." *Id.*

In the declarations at issue in the parties' Motions to Strike, each of the declarants–Paul Boyle, Mike Martin, Phillip McCollough, Greg Gossett, and Kevin Voss–states that he has personal knowledge of the facts contained in the statements. Thus, the court is bound to accept the declarants' statements as true, unless the circumstances establish a lack of personal knowledge or otherwise demonstrate that the declarants' statements are improper.

The court finds that most of the objections in the parties' Motions to Strike lack merit. Many of the parties' objections focus on whether the statements made in the parties' briefs or declarations offered in support of their briefs are truthful or accurate. However, a dispute of fact or question of credibility is not a basis for striking a statement from a declaration. While the parties' Motions to Strike may raise good fodder for cross-examination at trial, for the most part,

they do not present valid grounds to strike at the summary judgment stage. Truthfulness is for the jury, not the court, to decide. Therefore, the court will **DENY** Boyle's Motion to Strike in its entirety, and will **DENY** all of Pell City's Motion to Strike, except for Pell City's objections to paragraphs 18-20 of Phillip McCollough's declaration.

The court finds that Pell City's objections to Paragraphs 18-20 of Phillip McCollough's declaration (doc. 47-3) have merit. Phillip McCollough worked for Pell City as a Heavy Equipment Operator from 2002 to 2015. In Paragraph 18 of his declaration, McCollough states, "Paul could have done field inspections (lights, signs, potholes, etc.), parts running, prisoner transport, driving smaller trucks, among other things." In Paragraph 19, he states, "We had plenty of that type of work to keep someone busy full time." In Paragraph 20, he states, "There were other trucks available (not heavy equipment) that Paul could have driven, like regular trucks." The court finds that McCollough is not competent to testify as to what duties Boyle could perform with his back condition. Additionally, McCollough was not a supervisor and had no personal knowledge of the positions that were available in the Street Department at that time. Accordingly, the court will **GRANT** Pell City's Motion to Strike as to these paragraphs from Phillip McCollough's declaration.[1]

The court notes that statements in declarations may also be stricken when they are unambiguously contradicted by prior deposition testimony. *See, e.g., Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to

---

[1] Alternatively, even if the court considered this evidence, it would not impact the court's decision. Boyle would still be precluded from making statements contrary to his disability applications and would still be unable to establish his *prima facie* case, as discussed in greater detail below.

unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

Boyle moved to strike several statements from Greg Gossett's affidavit, contending that Gossett's previous deposition testimony contradicted the timeline of the events reflected in Gossett's affidavit. After reviewing the deposition testimony at issue, however, the court finds that Gossett's deposition testimony is ambiguous. In his deposition, Gossett testified that he resigned three to four weeks "prior to that job coming open." It is unclear whether "prior to that job coming open" refers to the date the job was posted or to the date that Mike Martin, who previously held the position, retired. Accordingly, Gossett's ambiguous deposition testimony does not provide a sufficient basis for striking statements from his affidavit.

## III.    Motion for Summary Judgment

Having determined what evidence it may consider, the court will now address the Defendant's Motion for Summary Judgment.

### A.    Legal Standard

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden shifts to the non-moving party to produce sufficient favorable evidence "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (internal citations omitted).

In ruling on a motion for summary judgment, the court should view all evidence and inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). The evidence of the non-moving party "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255.  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks and citations omitted).  This standard exists because "the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson*, 477 U.S. at 255).

After both parties have addressed the motion for summary judgment, the court must grant the motion only if no genuine issues of material fact exist and if the moving party is entitled to

judgment as a matter of law. *See* Fed. R. Civ. P. 56.

      B.    <u>Statement of Facts</u>

Paul Boyle began working for Pell City in March 2000 as a Heavy Equipment Operator. The job description for the Heavy Equipment Operator position states that the employee must have the strength to lift 100 pounds, mobility to climb on top of or crawl under various equipment, and physical tolerance to work outdoors under adverse conditions. The job description also states that the Heavy Equipment Operator is responsible for "Equipment Operation," which includes tasks such as operating street sweepers, dump trucks, backhoes, loaders, motor graders, bush hogs, and dozers. As a Heavy Equipment Operator, Boyle was also responsible for maintaining street signs, patching pot holes, picking up trash along the roads, and performing demolition.

On July 16, 2001, Boyle fractured two vertebrae when he fell off a roof while doing demolition work for the City.

Boyle eventually returned to work for the City, with certain restrictions from his doctor. Boyle's physician wrote that several tasks listed on the Heavy Equipment Operator job description "would be detrimental to Mr. Boyle's current and future functional status." (Doc. 45-1, at 76). Boyle's physician further explained that "[t]hese actions require Mr. Boyle to lift heavy objects and operate machinery which can cause excessive jarring to his axial skeleton." (*Id.*).

In his deposition, Boyle testified that, after his accident, operating any of the pieces of equipment listed in the job description for the Heavy Equipment Operator would cause him to be "jostled" and would cause him pain and discomfort. (Doc. 45-1, 34:11-14, 49:8-50:1).

When Boyle returned to work, the City created a light duty position for him, which

allowed him to help a utility department secretary do clerical office work. This position allowed Boyle to both sit and stand as his pain required.

Afer Boyle had worked for a period of time doing clerical work in the utility department, Mike Martin, Street Superintendent and Boyle's direct supervisor, assigned Boyle to work in the shop answering phones, completing paperwork, and retrieving parts. Boyle was allowed to complete these tasks at his pace, and the duties did not create more pain in his back. Martin never insisted that Boyle operate a piece of heavy equipment if Boyle did not feel like he could because of his pain.

In November 2005, Martin and Boyle drafted an agreement on Pell City letterhead entitled "Aggreement [sic] between Mike Maritn [sic] & Paul Boyle." (Doc. 45-1, at 74). This agreement was signed by Martin, Boyle, and Judy Tipton, Pell City's Personnel Officer. In the agreement, Martin designated Boyle as the person in charge of the Street Department in the event that Martin was not present.

The agreement stated that Boyle would act as the foreman/supervisor for the Street Department until the position was officially posted, or for a period of two years, at which time the agreement would be renegotiated. The agreement also indicated that "termination of the foreman/supervisor position will be given in writing, with proper notice, to Paul Boyle, and he will return to daily work as a Heavy Equipment Operator for the Street Department, with no lost wages." *Id.* The Foreman position was never posted, and the agreement was not renegotiated after two years, as the agreement indicated it would be. Boyle also never received written notice that he was terminated from the position of Foreman.

The agreement further stated that the Foreman position would be a lateral move for Boyle

at the Heavy Equipment Operator's pay. The agreement was never signed by the Mayor or the City Council. The parties disagree as to whether Martin had the authority to enter into an agreement such as this one on behalf of the City.

Boyle contends that, from 2005, when this agreement was executed, until 2012, when Mike Martin retired, Boyle was considered the Street Department Foreman and performed all of the duties of the Foreman full-time. Additionally, Boyle testified that he "ran the office, answered phones, scheduled work for the guys, receiving, shipping, ordering parts, dealing with the citizens of Pell City, going around checking jobs, looking for potholes, inspecting street signs." (Doc.45-1, 15-20). Boyle also occasionally operated heavy equipment, at his own pace; however, Boyle testified that Martin never forced him to operate heavy equipment and that, when the pain was too bad, he was allowed to stop.

During this time period, Mike Martin gave Boyle positive performance reviews. On these evaluations, however, Martin listed Boyle's position as "Heavy Equipment Operator," not Street Department Foreman.

The parties agree that during the time period Boyle was acting as Foreman, Jeff Crowe had the official title of Street Department Foreman. Crowe retained both the title and pay of the Foreman position at all times relevant to this lawsuit. Boyle, however, contends that Crowe did not actually perform any of the Foreman duties between 2005 and 2012, and worked as a mechanic in the shop instead.

Sometime in 2012 (the parties disagree as to whether it was in April or in the summer), Boyle learned that Martin planned to retire from his position with the City as Street Superintendent. Boyle alleges that he then heard from another Pell City employee, Kevin Voss,

that Greg Gossett was interested in the position, and that if Greg Gossett got the job, he would fire Boyle. Boyle did not address this statement with Gossett. Rather, after hearing this statement, Boyle decided to apply for disability retirement through the Retirement Systems of Alabama ("RSA"). Martin was still the Superintendent when Boyle made this decision, but he had already made the decision to retire at this point, and his retirement became effective as of July 1, 2012. Boyle testified that he applied for disability retirement so that he would not "lose everything [he] had" and "be out on the street." (Doc. 45-1, 139:17-23).

Under the RSA, an employee is eligible for disability retirement benefits if he has been employed with credible service for ten years and cannot perform the essential functions of the job. Generally, employees who have been terminated are ineligible to receive disability retirement benefits. However, vested employees–employees who have ten or more years of service– receive their regular retirement benefits beginning at age 60 regardless of whether they are terminated.

Boyle submitted his first application for RSA disability retirement on June 14, 2012. As required by the RSA, Boyle's application included a statement from his physician. In this statement, Boyle's physician certified that Boyle was "totally incapacitated for further performance of his/her duty" and that no "reasonable accommodations . . . could be made by the patient's employer to allow this patient to continue his/her employment." (Doc. 45-1, at 86-87). Boyle's physician also indicated that Boyle was restricted from operating heavy equipment, lifting more than 3-4 pounds, standing longer than 5-10 minutes continuously, and sitting longer than 10-15 minutes continuously.

Boyle also included as part of his application a letter from Mike Martin that outlined the

extent of Boyle's disability. In this letter, Martin explained that he had "seen a slow regression in Paul's physical ability to perform on a daily basis." (Doc. 45-1, at 81). Martin wrote that Boyle was "unable to sit for long periods of time in a truck or on a piece of equipment;" that Boyle was "no longer able to direct traffic due to the fact that he cannot stand for long periods of time"; and that Boyle had difficulty climbing up and down steps and ladders; doing any type of low work, such as working on equipment or changing tires; and walking long distances. (*Id.*). Boyle's first application for disability retirement was denied on July 5, 2012.

Greg Gossett started working as the Street Superintendent on July 3, 2012. Boyle contends, however, that Gossett was selected for this position and began preparing to leave his position at the City Council much earlier. Prior to applying for the position, Gossett told Jeff Crowe and members of the City Council that he was interested in the position. Gossett also asked Mayor Bill Hereford and City Attorney John Rea for an opinion on whether he, as a member of the City Council whose term was ending, could apply for the position. Rea contacted the Alabama Attorney General for his opinion as to whether Gossett could apply. After learning that he could apply, Gossett resigned from the City Council, applied for the Street Superintendent position, and was selected for the job.

After Gossett became Superintendent, he removed Boyle from the Foreman position and announced that all employees should report to Jeff Crowe as Foreman. Gossett testified that he made the decision to put Jeff Crowe back on as Foreman because he was being paid to be Foreman, while Boyle was receiving Heavy Equipment Operator pay.

As Street Superintendent, Gossett first ordered Boyle to inventory the entire Street Department shop. Boyle contends that the inventory job was physically demanding because it

11

required pushing, pulling, bending, squatting, and lifting of heavy parts and machinery. Gossett, on the other hand, testified that he thought that inventory was a light duty job that did not require anything beyond Boyle's physical limitations. Boyle followed Gossett's instructions and inventoried the shop. Boyle testified that he found a stool that he could use to sit whenever he needed to while doing inventory; however, Boyle found that the inventory job still severely aggravated his back. Boyle contends that he told Gossett that doing inventory hurt his back, but that Gossett ignored his complaints and told him to continue. Boyle continued to do inventory until the effective date of his retirement.

In his deposition, Boyle testified about one time when Gossett ordered him to operate heavy equipment. Boyle testified that Gossett required him to operate a backhoe and a dump truck. Boyle could not recall if Gossett had ordered him to operate heavy equipment on any other occasions. After operating the heavy equipment, Boyle experienced severe pain. The parties dispute whether Boyle complained to Gossett about the pain he experienced after operating the heavy equipment.

At one point, Boyle took two days off from work because of his pain. When Boyle returned to work, Gossett formally reprimanded him. Boyle contends that he was reprimanded for taking time off, while Gossett contends that Boyle was reprimanded for not following the policy for reporting absences. Boyle refused to sign the write-up.

Gossett did not sit down with Boyle and discuss which tasks he could do or what accommodations Pell City could offer. Gossett testified in his deposition that he did not look at other jobs because "there's nothing in the street department that is a light duty job other than the inventory I put him to doing." (Doc. 45-2, 86:19-21).

12

Mike Martin stated that if he had not retired, he would have kept Paul in the Street Department Foreman position. Martin also stated that "[e]ven if Paul could no longer work in the Foreman position, for whatever reason, there were always other jobs he could have performed, both within the Street Department and other City departments." (Doc. 47-2, ¶ 39). Martin further asserted that "Paul could have done things like running for parts; inspections of lights, signs, or potholes; transporting prisoners; paperwork; or other field administrative duties" and that he could not "see how leaving Paul in the foreman position would be an undue burden on the City." (*Id.*, ¶¶ 37, 40).

Boyle submitted his second application for RSA disability retirement on August 21, 2012. Again, his application was accompanied by a physician's certification. Boyle's physician certified that Boyle was "totally incapacitated for further performance of his/her duty"; that his disability was permanent; and that there were "probably not" any reasonable accommodations that could be made for Boyle "based on his chronic pain." (Doc. 45-1, at 98-99). Boyle's second application for disability retirement was approved, and his retirement became effective as of October 1, 2012.

Since being approved for disability retirement, Boyle has submitted periodic medical examination reports, in accordance with the RSA's reporting requirements. In October 2013, November 2014, and November 2015, Boyle's physician re-certified that Boyle was "totally incapacitated for further performance of his/her duty" as a Heavy Equipment Operator; that his disability was permanent; and that no reasonable accommodations existed that would allow him to continue his employment.

Boyle also applied for Social Security Disability Benefits around November 2012 and

was approved approximately a year later. In a Residual Functional Capacity Form submitted to the SSA, Boyle's physician stated that Boyle could not continue or resume work at his current or previous employment; that his disability was not likely to change; and that Boyle would never be able to return to work, with or without restrictions. (Doc. 45-7, at 7).

C.     Discussion

The only remaining claims in this action are Boyle's failure to accommodate and termination claims, which are both brought under Section 504 of the Rehabilitation Act.

The Rehabilitation Act generally "prohibits any program or activity receiving federal funds from discriminating against otherwise qualified individuals with a disability." *Skotnicki v. Bd. of Trustees of the Univ. of Ala.,* 631 F. App'x 896, 903 (11th Cir. 2015) (citing *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000)); 29 U.S.C. § 794(d)). To establish a *prima facie* case under the Rehabilitation Act, a plaintiff must show: "(1) [he] was disabled; (2) [he] was a qualified individual; and (3) [he] was discriminated against by way of the defendant's failure to provide a reasonable accommodation," or as to Boyle's termination claim, that he suffered an adverse employment action because of his disability. *Skotnicki*, 631 F. App'x at 903 (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)).

1.     "Qualified Individual"

Pell City first argues that it is entitled to summary judgment on both of Boyle's claims because Boyle cannot demonstrate that he was qualified for the position of Heavy Equipment Operator. "The term 'qualified individual' means an individual, who, *with or without reasonable accommodation*, can perform the essential functions of the employment position . . . ." 42 U.S.C.

14

§ 12111(8) (emphasis added).[2]

Pell City contends that Boyle has admitted that he was not qualified in his applications for disability benefits with the Retirement Systems of Alabama and the Social Security Administration, and that he is now precluded from making statements to the contrary.

The United States Supreme Court has addressed the extent to which applications for disability benefits and claims for damages under the ADA conflict. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999). The Supreme Court found that claims for Social Security Disability Insurance benefits and claims for damages under the ADA "do not inherently conflict to the point where courts should apply a special negative presumption" that estops the recipient from pursuing an ADA claim. *Id.* at 802. The Supreme Court based this holding, in part, on the fact that "when the SSA determines whether an individual is disabled for SSDI purposes, it does *not* take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI." *Id.* at 803. The ADA, on the other hand, defines a "qualified individual" as "an individual who, *with or without reasonable accommodation*, can perform the essential functions of the employment position . . . ." 42 U.S.C. § 12111(8) (emphasis added). Thus, "an ADA suit claiming that the plaintiff can perform her job *with* reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform her own job (or other jobs) *without* it." *Cleveland*, 526 U.S. at

---

[2] The Rehabilitation Act states that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201 to 12204 and 12210), as such sections relate to employment." 29 U.S.C. § 794(d).

803 (emphasis in original).

The Supreme Court noted, however, that, "in some cases an earlier SSDI claim may turn out genuinely to conflict with an ADA claim." *Cleveland*, 526 U.S. at 805. The Court explained:

> [A] plaintiff's sworn assertion in an application for disability benefits that she is, for example, "unable to work" will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation. For that reason, we hold that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation.

*Id.* at 806.

The Eleventh Circuit has interpreted *Cleveland* to require a careful examination of the facts to determine whether the plaintiff has offered a satisfactory explanation for the apparent contradiction between an application for disability benefits and an ADA claim. *See, e.g.*, *Talavera v. School Bd. of Palm Beach Cnty.*, 129 F.3d 1214, 1220 (11th Cir. 1997) ("Whether in any particular situation there is an inconsistency between applying for SSD benefits and bringing an ADA claim will depend upon the facts of the case, including the specific representations made in the application for disability benefits and the nature and the extent of the medical evidence in the record."). Further, the Eleventh Circuit has explained that, although an ADA plaintiff who previously applied for SSDI benefits is not automatically estopped from pursuing an ADA claim, the plaintiff is "estopped from denying the truth of any statements made in her disability application." *Id.* "[A]n ADA plaintiff should not be permitted to disavow any statements she made in order to obtain SSD benefits." *Id.*

In the instant case, Boyle first applied for RSA disability benefits on June 14, 2012, while Martin was still Superintendent and Boyle had not yet been removed from the Foreman position.

16

As stated previously, this application contained a physician's certification that Boyle could no longer perform his job duties and that reasonable accommodations could not be made for Boyle to continue his employment. Neither Boyle nor his physician stated anywhere in Boyle's application that Pell City could accommodate Boyle by allowing him to work as the Street Department Foreman or by allowing him to perform other administrative tasks. The application also included a letter from Mike Martin detailing Martin's observations of Boyle's disability and limitations; namely, that Boyle had become increasingly incapable of performing the duties of the Heavy Equipment Operator position.

After his first application was denied, Boyle reapplied for RSA disability retirement on August 21, 2012. As described above, Boyle's application was again accompanied by a statement from his physician certifying that Boyle was incapacitated for performance of his job duties and that Pell City probably could not make reasonable accommodations for Boyle. RSA approved Boyle's second application for disability retirement, and his retirement became effective as of October 1, 2012. Since Boyle was approved for RSA disability retirement, Boyle's physician has periodically re-certified that Boyle is completely unable to perform his job duties and that no reasonable accommodations exist that would allow him to continue his employment.

Boyle also applied for Social Security Disability Benefits in late 2012 and was approved approximately a year later. His Social Security application included a physician's certification that Boyle's condition was unlikely to change and that he would not be able to return to work, with or without restrictions.

Boyle now represents to the court that, contrary to the statements in his disability applications, he was qualified for the position of Heavy Equipment Operator between June and

October 2012, when he alleges that Pell City failed to accommodate him and that Pell City constructively discharged him.

Boyle contends that he has offered a sufficient explanation for the apparent inconsistencies in his RSA and SSDI applications on the one hand and his claims for damages under the Rehabilitation Act on the other. Boyle contends that Pell City's lack of accommodation forced him to seek disability benefits. He also argues that his physician's certifications were based on the Heavy Equipment Operator position with no modifications and that his physician's "disability statements were made in the same forum as Cleveland's–one where the physician did not know all of the reasonable accommodations Defendant could have offered." (Doc. 47, at 22).

The court disagrees. In *Cleveland*, the Supreme Court explained that the SSA "does *not* take the possibility of 'reasonable accommodation' into account" when evaluating an individual's application for SSDI benefits. 526 U.S. at 803. In contrast, the RSA *does* take the possibility of reasonable accommodations into account when evaluating applications for disability retirement benefits. The RSA form for the "Statement by Examining Physician" specifically asks the question, "In your opinion, are there reasonable accommodations that could be made by the patient's employer to allow this patient to continue his/her employment?" (Doc. 45-1, at 87). In June 2012, Boyle's physician answered "no." (*Id.*). In August 2012, Boyle's physician answered "probably not, based on chronic pain." (*Id.* at 99). In October 2013, November 2014, and November 2015, Boyle's physician answered "no" each time. (*Id.* at 103, 105; Doc. 45-6, at 4).

With these certifications, Boyle represented to the RSA that, both before and after the allegations material to this lawsuit, he was totally incapacitated and that Pell City could not offer

him any reasonable accommodations, including a permanent assignment to the Foreman position, that would allow him to perform his duties. Boyle may not avoid these representations now by suggesting that his physician did not know all of the reasonable accommodations that were available to Boyle or that the physician's certifications were based only the Heavy Equipment Operator position with no modifications. Boyle signed his RSA Applications and swore, under oath, that the statements made in his applications were true. Accordingly, Boyle is "estopped from denying the truth of [these] statements." *Talavera*, 129 F.3d at 1220.

Consequently, the court finds that Boyle has not offered a *sufficient* explanation for the inconsistencies in his disability benefit applications and his current Rehabilitation Act claims. Boyle's representations to the RSA that he was completely incapacitated and that no reasonable accommodations existed fly in the face of his present assertions that he was a qualified individual and that Pell City could have provided him with reasonable accommodations. Boyle cannot have it both ways. The court, therefore, finds that Boyle's representations in his disability benefit applications demonstrate that he was not qualified for the position of Heavy Equipment Operator. Pell City is accordingly entitled to summary judgment on each of Boyle's remaining claims.

2.    "Reasonable Accommodation"

Alternatively, even if Boyle were not precluded from making statements contrary to his disability applications and could establish that he was a qualified individual, his failure to accommodate claim still fails because Boyle cannot establish that Pell City failed to provide him a *reasonable* accommodation.

In establishing his *prima facie* case, Boyle has "'the burden of identifying an accommodation, and of demonstrating that the accommodation allows him to perform the job's

essential functions.'" *Skotnicki v. Bd. of Trustees of Univ. of Ala.*, No. 2:11-CV-03497-RDP,

2014 WL 3891973, at *10 (quoting *Lucas,* 257 F.3d at 1255-56). Boyle principally argues that

Pell City could have accommodated him by allowing him to continue working as the Street

Department Foreman.

Although Boyle had been acting as the Street Department Foreman since 2005, Jeff

Crowe retained the title and position of Street Department Foreman at all times Boyle was

performing Foreman duties. Boyle agrees that for the entire time he worked for the City, he was

compensated as a Heavy Equipment Operator. Pell City had no obligation to permanently assign

Boyle to the Foreman position because it was not a vacant position and because it would have

been a promotion. *See Lucas*, 257 F.3d at 1256 ("[T]he ADA may require the employer to

'reassign,' i.e., transfer, the disabled employee to a vacant position as a reasonable

accommodation. The reassignment duty, however, does not require the employer to bump

another employee from a position in order to accommodate a disabled employee."); *Skotnicki*,

631 F. App'x at 903 ("Any duty to reassign does not, however, require the employer to bump

another employee from a position, to create a new position, to promote the disabled employee, or

to assign the disabled employee to a position for which he is not qualified.").

The fact that Boyle performed the duties of Foreman for many years while Martin was

Superintendent does not demonstrate that permanent reassignment to the Foreman position

would be a reasonable accommodation. Eleventh Circuit case law is clear: "[T]he fact that an

employer has previously granted a requested accommodation does not render that

accommodation reasonable." *Webb v. Donley,* 347 F. App'x 443, 446 (11th Cir. 2009); *see also*

*Sidaris v. Runyon*, 967 F. Supp. 1260, 1268 (M.D. Ala. 1997) ("[T]he Defendant is not, as a

matter of law, required by the Act to assign Plaintiff to a permanent light-duty or continuing temporary light-duty position as it may have done in the past."). The fact that Pell City, while Mike Martin was Superintendent, may have gone above and beyond what was legally required of it in providing accommodations to Boyle does not demonstrate that those accommodations were reasonable.

Moreover, to the extent that Boyle argues that he could have performed other tasks such as "operational paperwork, parts runner, street flagging, prisoner transport, searching for pot holes, stop light inspections, sign inspections, or field administrative duties" (doc. 47, at 25), to assign Boyle to these tasks would require the City to eliminate essential functions from Boyle's position. Assigning Boyle to complete these tasks would not be a reasonable accommodation because "[a]n employer is under no obligation to eliminate or reallocate an essential job function in order to accommodate a disabled employee." *Sidaris*, 967 F. Supp. at 1267 (citing *McCollough v. Atlanta Beverage Co.*, 929 F. Supp. 1489, 1501 (N.D. Ga. 1996)).

One of the essential functions of the Heavy Equipment Operator is, unsurprisingly, operating heavy equipment, such as street sweepers, dump trucks, backhoes, loaders, motor graders, bush hogs, and dozers. Boyle, however, testified in his deposition that operating any of these pieces of equipment would cause him to be "jostled" and would cause him pain and discomfort. (Doc. 45-1, 34:11-14, 49:8-50:1). Boyle's physician likewise certified in conjunction with Boyle's June 2012 RSA disability retirement application that Boyle could not operate heavy equipment. Additionally, Boyle's claims in this lawsuit are based, in part, on the fact that Gossett forced him to operate heavy equipment. The evidence demonstrates that Boyle could not operate heavy equipment with his disability. Consequently, any accommodation for Boyle would

necessarily require the elimination of the duty to operate heavy machinery. Elimination of the requirement to operate heavy equipment would not be a reasonable accommodation because it would require Pell City to remove an essential function from Boyle's position.

Accordingly, the court finds that Boyle's failure to accommodate claim additionally fails because Boyle has failed to identify a reasonable accommodation that would have allowed him to perform the essential functions of his position as Heavy Equipment Operator.

### 3.      "Adverse Employment Action"

Finally, as to his termination claim, even if Boyle could establish that he was a qualified individual, Boyle's termination claim would fail because he cannot demonstrate that he suffered an adverse employment action *because of* his disability.

Boyle argues that he suffered an adverse employment action in the form of a constructive discharge. Boyle contends that he was constructively discharged when Gossett removed him from the Foreman position.

First, Boyle cannot meet the standard for constructive discharge. "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Palmer v. McDonald*, 624 F. App'x 699, 704 (11th Cir. 2015) (citing *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009)); *see also Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (quoting *Thomas v. Dillard Dep't Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir. 1997)) ("To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in her position would have been compelled to resign.'"). Further, the standard for constructive discharge "is so high that the plaintiff 'must demonstrate a greater severity or pervasiveness of

22

harassment than the minimum requirement to prove a hostile working environment.'" *Dale v. Wynne*, 497 F. Supp. 2d 1337, 1344 (M.D. Ala. 2007) (quoting *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2002).

Boyle's allegations fail to meet this high standard. Boyle applied for disability benefits because he heard–before Gossett even got the position of Superintendent–that Gossett was going to fire him. Boyle did not talk with Gossett to determine whether he intended to fire him. A rumor is insufficient to establish constructive discharge. Gossett's actions once he became Superintendent also fail to establish constructive discharge. Once Gossett became Superintendent, he assigned Boyle to inventory the shop. Although working in inventory hurt Boyle's back, Gossett thought the inventory job was a light duty position. Boyle admitted that, while inventorying the shop, he found a stool and was able to sit down as needed. Boyle remembered one instance when Gossett ordered him to operate heavy equipment, and could not recall if Gossett had ordered him to do so on other occasions.

These circumstances are not so intolerable as to amount to a constructive discharge. Gossett's removal of Boyle from the Foreman position and requests for him to inventory the shop and operate machinery do not present the type of situation in which the Eleventh Circuit has found a viable claim for constructive discharge. *See, e.g.*, *Poole*, 129 F.3d at 553 (finding constructive discharge where plaintiff was "[s]tripped of all responsibility, given only a chair and no desk, and isolated from conversations with other workers"); *contra Palmer*, 624 F. App'x at 704 (finding that plaintiff had not met standard for constructive discharge where supervisor yelled at him, scolded him, and plaintiff believed "it was only a matter of time before management stepped up to get him fired for alleged cause, making him unemployable.").

23

Second, even if Boyle could meet the standard for constructive discharge, he cannot demonstrate that the adverse action was taken *solely* because of his disability. *See Palmer*, 624 F. App'x at 705 ("The Rehabilitation Act prohibits federal agencies from discriminating in employment against individual with disabilities 'solely by reason of her or his disability.' . . . It is not enough for a plaintiff to demonstrate that an adverse action was based partly on his disability; rather the plaintiff must prove that he suffered an adverse employment 'solely by reason of' his disability.").[3]

Even if Boyle's disability was part of Gossett's motivation in removing Boyle from the Foreman position, it was not Gossett's sole motivation. Gossett has testified that he removed Boyle from the Foreman position because another employee, Jeff Crowe, already had the title of Foreman and was being paid to be Foreman. Boyle has not shown that Gossett's given reason was illegitimate. Accordingly, Boyle cannot show that he was removed from the Foreman position *solely* because of his disability.

Thus, the court finds that Boyle's termination claim under the Rehabilitation Act fails for the alternative reason that Boyle has failed to show that he was constructively discharged *solely* because of his disability.

## IV.    Conclusion

For the reasons set out in this Opinion, the court finds that Defendant Pell City's Motion to Strike is due to be **GRANTED IN PART** and **DENIED IN PART**, and that Plaintiff Paul

---

[3] Boyle argues, in a footnote, that he need not show that his disability was the *sole* reason for the adverse employment action. Boyle contends that he only needs to show that he was discriminated against "because of his disability." To the contrary, the court finds that Eleventh Circuit precedent establishes that Boyle's disability must be the sole reason for the adverse employment action.

Boyle's Motion to Strike is due to be **DENIED**.

The court finds that Pell City's Motion for Summary Judgment is due to be **GRANTED** as to all remaining claims because Boyle has failed to establish his *prima facie* case for his claims under the Rehabilitation Act. The court will, therefore, **DISMISS** this action **WITH PREJUDICE**.

The court will enter a separate Order along with this Opinion.

**DONE** and **ORDERED** this 2nd day of September, 2016.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE